**FILED**

May 10 2018, 9:38 am

**C L E R K**
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT

Sean C. Mullins
Mark A. Bates
Lake County Public Defender's Office
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Laura R. Anderson
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Jeri Latoya Woods,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff.* | May 10, 2018<br><br>Court of Appeals Case No.<br>45A05-1707-CR-1744<br><br>Appeal from the Lake Superior<br>Court.<br>The Honorable Diane Ross Boswell,<br>Judge.<br>Trial Court Cause No.<br>45G03-1509-MR-10 |

**Sharpnack, Senior Judge**

## Statement of the Case

[1]     Jeri Latoya Woods and her family were angry that eighteen-year-old Aareon Lackey had apparently taken and sold one of her family's handguns.  She and her family forced Aareon and his sixteen-year-old brother Antonio Lackey to leave a motel, and ultimately drove them to a secluded, wooded area.  Woods

shot both young men in the head and abandoned their bodies, which were discovered weeks later. Woods appeals her two convictions of murder, both felonies,[1] and her two convictions of kidnapping, both Level 5 felonies.[2] We affirm.

## Issues

Woods raises three issues, which we restate as:

I.  Whether the trial court violated Woods's right to make a statement of allocution during sentencing.

II. Whether the trial court committed fundamental error by displaying bias against Woods during her testimony.

III. Whether the trial court abused its discretion in denying Woods' motion for mistrial in connection with a juror's request to be released from service during trial.

## Facts and Procedural History

The older victim, Aareon Lackey, had associated with Aarion ("Arey") Greenwood and his family in the past. Arey's family members include his grandfather, David Johnson III; his father, David Johnson IV ("Pops"); a brother, David Johnson V ("Dooney"); and his stepmother, Woods. Woods had seven children, the youngest three with Pops (who were thus Arey's half-

---

[1] Ind. Code § 35-42-1-1 (2014).

[2] Ind. Code § 35-42-3-2 (2014).

siblings).  Dooney's friend, Kiontay Cason, lived with Arey's family during the period relevant to this case.

[4]  In the spring of 2015, Dooney and Cason were incarcerated in juvenile facilities for offenses unrelated to this case.  Dooney learned that his family was upset because Aareon and Arey had apparently taken Pops' two handguns.  During recorded phone calls with Dooney and Cason, Woods used coded terms such as "jocks" and "poles" to describe the guns.  Tr. Vol. 11, p. 121; Vol. 15, p. 54.

[5]  Woods was also aware that Arey and Aareon had recently allegedly shot Damon Hill, whom she treated like a son.  They allegedly attacked Hill in a wooded area, and he fled the scene despite his wound, shedding wet clothes as he ran.  Hill said the guns Arey and Aareon used belonged to Pops.  Woods was upset about the shooting.  She visited Hill and told him Aareon was "going to get what they [sic] deserve."  Tr. Vol. 13, p. 26.

[6]  Dooney was released from the juvenile facility on June 23, 2015, and returned to Woods and Pops' house.  On June 26, 2015, Pops told Dooney and Cason that the family was going to pick up Arey from a different juvenile center and then find Aareon.  Pops wanted his handguns back. Woods, Dooney, Pops, Cason, and David Johnson III went to the juvenile center in David Johnson III's van.  Arey's then-girlfriend, Michelle Hughes, was waiting at the center in a Pontiac Bonneville.

[7]  When Arey exited the juvenile center, he entered David Johnson III's van, while Dooney left with Hughes in the Bonneville.  Hughes and Dooney looked

unsuccessfully for Aareon before going to Hughes' house, where Hughes returned one of Pops' handguns to Dooney. Later, Hughes drove Dooney to a small supermarket, where they reunited with Woods, David Johnson III, Pops, Cason, and Arey, all of whom were still in David Johnson III's van.

[8] While the group in the van was waiting for Hughes and Dooney, Woods told Cason, "We can't go get guns without guns." Tr. Vol. 10, p. 141. Cason saw an ex-girlfriend in the supermarket's parking lot, and he and Woods approached her. Both Woods and Cason asked the ex-girlfriend if they could borrow her handgun, but she said she had given it to someone else.

[9] Ahmad Ghouleh owned the supermarket and worked behind the counter. Woods lived nearby and was a frequent customer, stopping by as often as three to five times per day. She was aware Ghouleh owned a Glock 10 handgun. On the afternoon of June 26, 2015, Woods entered the store and asked Ghouleh to loan her his handgun, claiming she was scared because someone had broken into her house. Ghouleh gave her the Glock 10 in a paper bag, and Woods left the store and showed the handgun to Cason.

[10] When Dooney and Hughes arrived, Dooney gave Pops the handgun that he had retrieved from Hughes. In turn, Pops gave the gun to Cason. Next, the group traveled in the two vehicles to a motel where Aareon's family was staying. At some point prior to arriving at the motel, Woods called Hill. During the call, Hill heard Woods say to someone in the van, "I'm going to do

the mother f\*\*kers like how they did my son." Tr. Vol. 13, p. 31. She was referring to Hill as her son.

[11] When the group arrived at the motel, Jessyca Batiest, then known as Jessyca Lackey, was in one of the family's two rooms. Her then brothers-in-law, Aareon and Antonio, were also in the room. Arey knocked on the room's window, and Aareon and Antonio went out to the hallway. Batiest got in the shower, and when she was done, they were gone. She later noticed that Aareon and Antonio had left their shoes in the room, and Antonio had left his phone. Batiest thought that was odd.

[12] While Batiest was in the shower, Aareon and Antonio spoke with Arey and Dooney in the hallway. Dooney asked Aareon to return the handgun, and Aareon said he had given it to another person, Larry Doss. Pops, Hughes, and Cason entered the motel, and the group had a discussion in the exercise room. Pops became angry when Aareon said he did not have the gun. Pops, Arey, Cason, and Dooney escorted Aareon and Antonio out of the motel without letting them put on their shoes.

[13] Antonio was placed in the Bonneville with Arey, Dooney, and Hughes, while Pops put Aareon in the van with him, Woods, Cason, and David Johnson III. Arey contacted Doss via social media and telephone to ask him to return the gun. Doss refused, claiming he purchased it from Aareon and did not want to give it back.

[14]     The group drove to a trailer park in Hobart, Indiana to look for Doss. When they arrived at Doss' trailer, Aareon informed the group that Doss might be angry. Woods handed Dooney a handgun, and Cason still had Pops' handgun. They approached the trailer with Antonio and had him knock on the door, but Doss was not home. The three returned to their vehicles, and Dooney gave his handgun back to Woods.

[15]     The group left the trailer park. As they traveled, Pops repeatedly asked Aareon where the handgun could be found, and Aareon replied he did not know. Woods asked Aareon whether he broke into her house, and he denied it. After two brief stops, Woods stated, "I know what I'm finna [sic] to do, take us to the farm." Tr. Vol. 10, p. 165.

[16]     The group drove to property known as "the farm." It is in a rural portion of Hobart, Indiana, consisting of over thirty acres. Some of it is farmed for alfalfa, and other portions are wooded. Pops was familiar with the property through his father's sister, who knew the farm's owner.

[17]     The group parked the van and the Bonneville on a long driveway at the farm. Woods again asked Aareon about breaking into her house, and he denied it. He was nervous and scared. Woods told Cason to go get Antonio from the Bonneville.

[18]     Cason brought Antonio to the van. Next, Cason went back to the Bonneville and told Arey and Hughes that Woods wanted them, leaving Dooney in the Bonneville. Arey and Hughes walked over to the van, and Woods asked them

if Aareon had mentioned he broke into Woods' house. Arey admitted Aareon had made such a statement.

[19] After Arey's admission, Woods said, "F**k it. Come on, let's go." *Id*. at 171. Woods and Cason escorted Aareon and Antonio down a path. Arey initially went with them, but Woods and Cason pulled out handguns and ordered Arey to return to the cars. Arey ran back to the vehicles, and Woods and Cason directed Aareon and Antonio to keep walking.

[20] David Johnson III caught up with the group. When they reached a wooded area, he ordered Aareon and Antonio to take off their clothes. Aareon and Antonio complied. Once they were in their underwear, Woods ordered them to get on their knees. Aareon did not comply, so Cason hit him with his gun. Both young men continued to plead for their lives on their knees. Woods ordered them to hug each other and then shot them in the head. They fell to the ground. At David Johnson III's urging, Woods shot each of them a second time. The three then returned to the vehicles.

[21] Meanwhile, Pops got into the Bonneville with Dooney. He told Dooney that Aareon and Antonio were going to be "dealt with" because they had been disloyal. Tr. Vol. 8, p. 168. Hughes and Arey also returned to the Bonneville, and Dooney, Pops, Hughes and Arey left the farm in that vehicle. The van caught up to them shortly thereafter, and the two vehicles went back to Ghouleh's supermarket, where Woods returned the Glock 10 to Ghouleh in a paper bag.

[22]     The group went back to Pops and Woods' house, where they gathered at the van. Woods told them, "You all [sic] the only people that know what's going on and what happened, and if I find out any one of you all tells somebody what's going on, you all going to get the same treatment they got." Tr. Vol. 9, p. 6. Later that day, Hill went to Woods' house. He heard her say, "Mother f**kers got what they deserved" and "it is what it is." Tr. Vol. 13, p. 33.

[23]     On July 6, 2015, Aareon and Antonio's stepfather reported to the Merrillville Police Department that his stepsons were missing and had not contacted family members since June 25, 2015. Members of Aareon and Antonio's family tried to contact Arey, asking about the young men's whereabouts. At that point, Woods told Dooney that if he "ever got arrested or the investigators come see us, tell them that we picked up [Aareon] and dropped him off at [the trailer park]." Tr. Vol. 9, p. 7. She told Cason to tell the police a similar story.

[24]     On July 17, 2015, a family went to the farm to have a picnic. They entered the wooded portion of the property and discovered two human skeletons. Clothing and personal items were scattered nearby. Each skull had a hole in the head, and the holes were later identified as gunshot wounds, caused by identically-sized bullets, fired into the victims by someone standing above them. The skeletal remains were later confirmed as Aareon and Antonio's bodies by comparing the teeth with their dental records. Ballistics testing demonstrated that Ghouleh's handgun, which Woods had borrowed and returned, was the murder weapon.

After the media reported that the bodies had been found, Woods signed over custody of her five youngest children to her sister and left the state. On September 28, 2015, the State charged Woods with two counts of murder, two counts of kidnapping as Level 5 felonies, and two counts of murder in perpetration of kidnapping. Federal agents arrested Woods in Texas in February 2016, five months after she fled.

Woods' case was tried by a jury. She testified in her own defense, and the jury determined she was guilty as charged. The trial court merged the charges of murder in the perpetration of kidnapping with the murder charges and imposed a sentence. This appeal followed.

# Discussion and Decision

## A. Allocution

Woods argues the trial court deprived her of her right to address the court during sentencing because the court failed to directly advise her of her right to speak or ask her whether she had anything to say. A defendant's right to offer a statement on his or her behalf before the trial court pronounces sentence is known as the right of allocution. The right of allocution is rooted in the common law. *Biddinger v. State*, 868 N.E.2d 407, 410 (Ind. 2007). The Indiana General Assembly has codified the right as follows:

> When the defendant appears for sentencing, the court shall inform the defendant of the verdict of the jury or the finding of the court. The court shall afford counsel for the defendant an opportunity to speak on behalf of the defendant. The defendant may also make a statement personally in the defendant's own

behalf and, before pronouncing sentence, the court shall ask the defendant whether the defendant wishes to make such a statement. Sentence shall then be pronounced, unless a sufficient cause is alleged or appears to the court for delay in sentencing.

Ind. Code § 35-38-1-5 (2013). A defendant claiming that he or she was denied the right to allocution "carries a strong burden" in establishing the claim. *Vicory v. State*, 802 N.E.2d 426, 429 (Ind. 2004).

[28] There has been no Indiana Supreme Court decision in which a case has been remanded for resentencing because a trial court failed to advise a defendant per Indiana Code section 35-38-1-5 that he or she had a right to be heard prior to the imposition of sentence or because the defendant was not asked if he or she wanted to be heard prior to imposition of sentence where no objection was made in the trial court or no request to be heard was made.

[29] In *Vicory*, the defendant asked to make a statement while the trial court was deciding what sentence to impose for the defendant's violation of the terms of his probation. The trial court denied the defendant's request. The Indiana Supreme Court determined the right of allocution does not apply to probation revocation proceedings, except where the defendant requests to make a statement, the request should be granted. The Court further noted the purpose of allocution is to allow the trial court to consider the facts and circumstances of the case, and the purpose has been accomplished if "the defendant is given the opportunity to explain his view of the facts and circumstances." *Id.* at 430.

[30]     The *Vicory* court stated that the trial court should have granted the defendant's request to make a statement, but the court's refusal "did not affect his substantive rights such that reversal is warranted" because the defendant testified at the revocation hearing, thus accomplishing the goal of allocution. *Id.  See also Biddinger*, 868 N.E.2d at 412-13 (sentencing court erred in refusing to allow defendant to make statement at sentencing after a guilty plea, but error was harmless because defendant's version of events had already been introduced to the court at trial).

[31]     In *Angleton v. State*, 714 N.E.2d 156, 159 (Ind. 1999), a defendant was resentenced.  During the resentencing hearing, the court did not ask the defendant if he wanted to make a statement, and the defendant did not object or ask to make a statement.  He also declined the court's invitation to present witnesses.  The trial court had offered him the opportunity to make a statement during the original sentencing hearing.

[32]     The Indiana Supreme Court noted the defendant was aware of his right to offer a statement, both because he had been given that opportunity at the first sentencing hearing and because the defendant had been a practicing attorney. The Court concluded, "A defendant, especially one under these circumstances, may not sit idly by at a sentencing hearing, fail to object to a statutory defect in the proceeding, then seek a new sentencing hearing on that basis on appeal. The failure to object constitutes waiver." *Id.* (citing *Locke v. State*, 461 N.E.2d 1090 1092-93 (Ind. 1984) (trial court failed to ask defendant if he had anything to say before sentence was imposed, but claim was waived because defendant

failed to object), and *Robles v. State*, 705 N.E.2d 183, 187 (Ind. Ct. App. 1998) (same)).

[33] In the current case, Woods testified during trial at length, explaining her perspective on what happened. Among other topics, she repeatedly stated she was afraid of Pops. She also expressed sorrow at Aareon and Antonio's deaths while denying responsibility for the murders.

[34] At sentencing, the trial court asked Woods' counsel if Woods wanted to call any witnesses. Woods, through counsel, responded: "Judge, we would [sic] do not. There are several friends and family members of Ms. Woods that are present here in court, but we do not wish to call them as witnesses at this time." Sentencing Tr. Vol. II, p. 16. Woods offered letters of support from her friends and family, which the court accepted.[3]

[35] Next, each side presented argument on sentencing issues. Woods' counsel explained, among other arguments, "Jeri believes that she was foreclosed from being able to put before the jury a lot of the information regarding specific instances of physical abuse that she suffered at the hands of the co-defendant, [Pops] . . . ." Sentencing Tr. Vol. II, pp. 23-24. Counsel further explained that Woods was "heart broken" over the young men's deaths but maintained her innocence. *Id.* at 26. After counsel finished presenting argument, the court

---

[3] The letters were not marked as exhibits or otherwise included in the sentencing transcript.

asked the attorney, "Does your client wish to speak today?" *Id.* at 30. Woods' attorney responded, "No, your honor." *Id.* Woods did not disagree or object.

[36] Woods argues the trial court should have asked her directly if she would like to address the court. Woods argues that Indiana Code section 35-38-1-5 requires the court to "ask the defendant" whether he or she would like to make a statement. Regardless of whether the court should have directed the question to Woods or Woods' counsel, we find no reversible error. As was the case in *Vicory* and *Biddinger*, Woods testified at length at trial, thus providing the court with her version of events. In addition, this case is even stronger on the facts than *Vicory* or *Biddinger* because the trial court asked whether Woods wished to speak. After having been made aware she could present a statement on sentencing, Woods, through counsel, declined. Woods did not contradict her attorney or object to proceeding without giving her statement. As was the case in *Angleton*, Woods' failure to object or otherwise express a wish to address the court amounts to waiver of any claim under Indiana Code section 35-38-1-5.

[37] Woods cites *Jones v. State*, 79 N.E.3d 911 (Ind. Ct. App. 2017), in support of her claim. In that case, at sentencing the trial court asked Jones' attorney whether Jones wished to exercise his right of allocution. Jones' attorney said Jones did not wish to make a statement. A panel of this Court concluded Indiana Code section 35-38-1-5 requires the trial court to directly ask the defendant whether he or she wishes to address the court, comparing waiver of the right of allocution to waiver of the right to a trial by jury. As a result, the Court determined the trial court erred and remanded for a new sentencing hearing.

The Court further concluded a defendant should not be found to have waived a right of allocution by failing to speak up despite counsel's rejection of the offer of allocution. In dissent, Chief Judge Vaidik, citing *Angleton*, stated Jones waived his claim by failing to object. The Chief Judge further stated the right of allocution is not analogous to the right to a jury trial.

[38] We respectfully disagree with the majority's holding in *Jones* and decline to follow it. *Vicory* and *Biddinger* stand for the proposition that a trial court's failure to comply with Indiana Code section 35-38-1-5 is subject to harmless error analysis. In addition, we conclude *Angleton* and *Locke* are on point and establish that a defendant may waive the right of allocution by failing to object. The trial court offered an opportunity to give a statement, and we conclude from these facts that Woods chose not to speak. Following our Supreme Court's precedent, we conclude Woods has failed to carry her heavy burden of proving the trial court erroneously deprived her of her right of allocution.

## B. Alleged Bias and Fundamental Error

[39] Woods next claims the trial court demonstrated bias against her during her testimony, thus depriving her of her right to a fair trial. The law presumes that a judge is unbiased and unprejudiced. *Timberlake v. State*, 753 N.E.2d 591, 610 (Ind. 2001). Judges require broad latitude to run their courtrooms and to maintain discipline and control. *Brown v. State*, 746 N.E.2d 63, 70-71 (Ind. 2001). A defendant asserting judicial bias must show that the trial judge's actions and demeanor showed partiality and prejudiced the case. *Id.* at 71.

[40] Bias is not proven from judicial rulings alone. *Garland v. State*, 788 N.E.2d 425, 433 (Ind. 2003). Furthermore, intemperate comments may not necessarily demonstrate bias. As the United States Supreme Court has stated:

> [O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge.

*Liteky v. U.S.*, 510 U.S. 540, 555, 114 S. Ct. 1147, 1157, 127 L. Ed. 2d 474 (1994). "Even where the court's remarks display a degree of impatience, if in the context of a particular trial they do not impart an appearance of partiality, they may be permissible to promote an orderly progression of events at trial." *Rowe v. State*, 539 N.E.2d 474, 476 (Ind. 1989).

[41] Woods concedes she did not object to any of the trial court's statements or actions on grounds of bias. Where a defendant fails to object to comments a trial judge makes during trial, the issue of bias is waived for review. *Flowers v. State*, 738 N.E.2d 1051, 1061 (Ind. 2000). An appellant who seeks to overcome waiver must demonstrate fundamental error, which is a blatant error that denies the defendant due process. *O'Neal v. State*, 716 N.E.2d 82, 87 (Ind. Ct. App. 1999), *trans. denied*. If a judge is biased, fundamental error exists because trial before an impartial judge is an essential element of due process. *Rosendaul v. State*, 864 N.E.2d 1110, 1115 (Ind. Ct. App. 2007), *trans. denied*.

[42] Resolving Woods' accusation of bias requires a careful review of Woods' extensive trial testimony. It is not disputed that Woods was an obstreperous witness, especially on cross-examination. She concedes she "repeatedly failed to comply with the hearsay rules." Reply Br. p. 9. Indeed, on direct examination Woods repeatedly testified as to what others told her, despite requests by counsel not to tell the jury what others said. Tr. Vol. 14, pp. 94, 107-08, 114. Nevertheless, the trial court denied one of the State's hearsay objections and request to strike her testimony. *Id.* at 115-16.

[43] In addition, Woods gratuitously verbally attacked other witnesses on direct examination. She insulted Pops' parenting skills, to the point that the trial court instructed her to "just answer the question specifically" and instructed Woods' counsel to "be a little more direct with her." *Id.* at 87. Woods also insulted Arey and Dooney's mother, and the trial court struck her comments from the record. *Id.* at 86, 97. Finally, she described Hughes as a "pedophile" for being in a relationship with Arey, who was ten years younger. *Id.* at 99. In an attempt to keep Woods' testimony within the bounds of the Rules of Evidence, the court told Woods' counsel during a bench conference, "You're going to have to watch her, make sure she answers the questions, make sure you stick to the – yes, you're going to have to – you're going to have to maybe do a little something else with her because she's gabby." *Id.* at 104.

[44] This led to the first incident that Woods cites as proof of bias. On direct examination, she said she repeatedly urged Pops to get his guns back and then

"leave it alone." Id. at 117. Next, the following exchange occurred involving Woods' trial attorney (Ms. Perkins), Woods, and the trial court:

| | |
|---|---|
| [Perkins]: | What was his response? |
| [Woods]: | I'm not trying to hear that. |
| [Perkins]: | Okay. |
| [Court]: | Ms. Perkins. |
| [Perkins]: | And, again, I think I've laid some foundation, Judge, for – |
| [Court]: | For hearsay? |
| [Perkins]: | For the excited utterance. If she said he's upset, he's angry, he's pissed, this is – there are some exceptions here, I believe, Judge. |
| [Court]: | Go ahead. . . . |

*Id.* at 117-18.

[45] Woods argues the trial court's sua sponte interjection demonstrates bias. We disagree. Woods had demonstrated a propensity to utter hearsay testimony, and the trial court had repeatedly informed counsel to ask direct questions to avoid the issue. Despite the trial court's instructions, Woods' counsel explicitly asked Woods for Pops' response to her statement. The court properly interceded to ensure that counsel followed the Rules of Evidence. Further, the court allowed counsel to proceed once counsel raised exceptions to the hearsay rule. This exchange fails to demonstrate bias, let alone fundamental error.

[46] Shortly thereafter, Woods described going to the supermarket, and she stated Pops told her to go get Ghouleh's gun. Her counsel, Ms. Perkins, then asked her what she did next, and the following exchange occurred:

[Woods]:    That's - this is what I did. I asked him "For what?" and he –

[Court]:    And then what happened?

[Woods]:    He said, "Bitch, go" –

[State]:    Objection as to –

[Court]:    No, don't tell me what he said. What happened after that? You said, "For what?' What's the next thing you did?

[Woods]:    He made me go get it. That was the next thing I did. He –

[Court]:    Alright.

*Id.* at 119-20. During a break that immediately followed this exchange, Perkins informed the court that she had again counseled Woods about avoiding hearsay testimony.

[47]    Woods argues the court's instruction to her demonstrated bias. We disagree. The court may have been irritated, but any irritation was provoked by Woods' ongoing hearsay testimony despite admonishments by her counsel and the court. The court appropriately redirected her testimony to avoid hearsay, and we cannot conclude the court committed fundamental error.

[48]    Woods' direct testimony continued, and her counsel continued to caution her to avoid describing what other people said. *Id.* at 148, 152, 153. Nevertheless, even after being directly advised to avoid repeating other people's statements, she still repeated Pops' responses to her comments. *Id.* at 153-54. The State objected, and the court sustained the objection. Other incidents of hearsay passed without objection by the State or court intervention, although counsel

continued to advise her to avoid repeating other's statements. *Id.* at 156, 159, 164, 183. At one point, Woods acknowledged she "can't say what they said." *Id.* at 163.

[49] After testifying to her version of events at the farm, the following exchange occurred:

| | | |
|---|---|---|
| [Perkins]: | Did you shoot [Antonio]? |
| [Woods]: | No, I'm a mother. |
| [State]: | Objection, Your Honor. |
| [Court]: | Jeri – |
| [Perkins]: | What is – |
| [Court]: | Ms. Woods, just answer her question. That's it. I know that might be hard, but you have to just answer the question. Don't add anything to it. |
| [Perkins]: | Jeri, would you ever harm two teenage boys? |
| [Woods]: | No. |
| [Perkins]: | Why not? |
| [State]: | Objection, Your Honor. |
| [Court]: | And your objection is? |
| [State]: | Character evidence, 609, not – |
| [Court]: | Sustained. |
| [Perkins]: | Judge, 609 is not even appropriate, Judge. It's – it addresses prior convictions. |
| [State]: | I'm sorry. |
| [Perkins]: | So I'm not even sure what the objection is. |
| [State]: | I didn't mean to say that. It's a long day. |
| [Court]: | It doesn't – |

| [State]: | 404(b).  Sorry. |
| [Court]: | Doesn't – the objection, first of all, is in my mind is relevance, so – |
| [Perkins]: | Judge, may we approach because – |
| [Court]: | No.  Ms. Perkins, just finish with your witness. |
| [Perkins]: | Well, Judge, I mean, I don't know what more relevance we can have other than what's in her mind.  I mean, we're talking about this lady's been accused – |
| [Court]: | Approach. Approach. |

*Id.* at 168-70.  During a bench conference, the court ultimately overruled the State's objection.

[50]     Woods argues the trial court displayed bias by:  (1) granting the State's objection without allowing Woods to respond; and (2) raising the issue of relevance sua sponte.  Throughout the lengthy trial, the court ruled on several objections by both Woods and the State without waiting for the other side's response.  Further, the court's sua sponte discussion of relevance may have been ill-advised, but the court ultimately overruled the State's objection and allowed Woods to proceed.  We cannot conclude the court's comments demonstrated bias.

[51]     When the State cross-examined Woods, the prosecutor and Woods had several contentious exchanges.  Tr. Vol. 15, pp. 40-42.  The court advised Woods to answer the State's questions without supplying explanations or nonresponsive answers.  *Id.* at 42, 51, 55.  On the other hand, the court also barred the State

from requiring Woods to identify which sister she spoke with during a specific conversation, prevented the State from seeking answers from Woods that would have required hearsay, and sustained Woods' objection to one of the State's questions as argumentative. *Id.* at 50, 58-59, 67.

[52] After a particularly contentious exchange between the prosecutor and Woods, Woods' counsel objected as follows:

> [Perkins]: Judge, I'm going to just object to the commentary by counsel, Judge.
>
> [Court:] Approach, approach.
>
> [State]: I asked her if I should stand closer.
>
> [Court]: Approach.
>
> (BENCH CONFERENCE HELD ON THE RECORD.)
>
> [Perkins]: This is antagonistic, to say to her, well, you can see me.
>
> [Court]: Your client is going to hang herself here. Now, I can tell her that. I know you've already told her. At some point, if she has another outbreak, I'm going to send the jury out and I'm going to tell her myself.
>
> She's not doing herself any favors here. She's going to tell her story between direct cross-exam and redirect. She's going to get to tell her story. She's going to get her day in court, but she's not going to be acting up, trying to run this show.
>
> Yes, it's getting a little antagonistic. I'm not going to stop it because she's the precipitator, and if she wants to ruin her chances, let her go.
>
> [State]: I'll move on. I can go on.
>
> [Court]: Thank you.

[State]:        Thanks.

*Id.* at 74-76.

[53]  Woods argues the trial court's remarks demonstrate hostility to Woods rather than a mere intent to control the courtroom. We disagree. The court during this exchange expressed its intention to balance allowing Woods to tell her version of events against preventing her from engaging in obstreperous behavior. The court did not impose any sanctions, choosing instead to inform Woods' counsel that the next step to address any further outbursts would be an admonition outside the presence of the jury. This exchange does not demonstrate the court was biased against Woods.

[54]  Later during cross-examination, the following exchange occurred while the State asked Woods about what she did and saw while her family was outside Larry Doss's trailer:

> [State]:      All right. So all the testimony with respect to individuals trying to either Facebook Larry or call Larry, you didn't hear none of that going on in the car?
>
> [Woods]:    No.
>
> [State]:      Because you and Daddy are sitting in the front seat talking about hunting and fishing?
>
> [Woods]:    We're not talking about hunting and fishing.
>
> [State]       All right.
>
> [Woods]     And the Facebook messages and everything, stuff shows that it's Arey doing it. Arey was not in the car with me.
>
> [State]:      Right, but he was outside the trailer; right?

| | |
|---|---|
| [Woods]: | And I'm supposed to know what he's doing on Facebook? |
| [State]: | And you're not like miles away from him; right? You're pretty close to each other in terms of distance? |
| [Woods]: | He's outside the car at the trailer at the door. |
| [State]: | Right. |
| [Woods]: | How am I supposed to know what he's doing? |
| [State]: | So you didn't see – |
| [Woods]: | I don't know whose house this is. I don't know their little friend. |
| [State]: | So you didn't see – |
| [Woods]: | The guy said he didn't know who I was or recognize me. |
| [State]: | So you didn't see anything? |
| [Woods]: | No, I did not see anything. |
| [State]: | All right. |
| [Court]: | Okay. All right. We're going to take a break right here. |
| | Pam, can you – we're going to take a few-minute [sic] break right here. Will you take the jury out. [sic] |
| [Bailiff]: | Okay. |

(JURY EXITS THE COURTROOM AT 9:49 A.M.)

| | |
|---|---|
| [Court]: | Close the door. |
| [Bailiff]: | I was standing right there so I don't know why we're breaking. Is it a break or because you're yelling at everybody? |
| [Court]: | That's right, that's right. Ms. Woods. |
| [Woods]: | Yes. |

[Court]: I have told you several times, I've instructed your attorney to tell you, and I know she has had a conversation with you about your attitude and your approach to answering these questions.

You are going to get your story told. I know you have one and you want to tell it; that's why you're on the stand. That's why you have an attorney, to help you do that.

Let her do her job. Stop trying to do her job. Just answer the questions as they are put to you.

Don't try to explain anything, don't try to add anything. I know you think it's important, but we have rules here and we have to follow the rules.

If you can't follow the rules, I'll hold you in contempt of court, okay, for not answering the questions properly. 'Yes' or 'no,' or just the short answer to what you've been asked, not an explanation.

And this antagonistic attitude is not helping you at all here today. Okay.

Now, Ms. Perkins, anything you want to say to your client about this topic?

[Perkins]: Not on the record.

[Court]: Okay. All right. We can go off the record.

[Perkins]: Thank you.

(A RECESS WAS HAD AT 9:51 A.M.)

(JURY RETURNS INTO OPEN COURT AT 10:16 A.M.)

Tr. Vol. 15, pp. 85-88.

[55] Woods argues the court's admonishment of her proves bias. We reject this argument. Immediately before the break, Woods was argumentative and failed

to answer the State's questions, thus continuing her intractable conduct. The court followed through on its prior statement that further misbehavior by Woods would result in an admonishment outside the jury's presence. Instead of showing bias, the court again demonstrated its commitment to ensuring Woods had an opportunity to share her version of events while not tolerating disorder in the court.

[56] On a related note, Woods argues the court's abrupt call for a break immediately after the vexatious exchange between the prosecutor and Woods may have prejudiced the jury. We disagree. The court did not tell the jury why it was calling for a break, and the record does not reflect that the court openly expressed anger or even irritation at Woods at this point in the cross-examination. The court called breaks several times throughout the lengthy trial and did not always provide an explanation to the jury. We cannot conclude the court committed fundamental error.

[57] After the State finished cross-examination, Woods testified on redirect examination and recross examination. Finally, the jury submitted questions for Woods, and the court presented several of them, followed by further questioning of Woods by the parties. During the State's questioning, the following exchange occurred:

> [State]: Okay. And you indicated earlier this morning when I was questioning you about your marital status, you indicated that it was the end of June when you filed for divorce; correct?

[Woods]: Could have been the end of June. I said it was in June. That was in 2015; it's 2017.

[State]: Okay. I understand that. But now when you were asked a question by one of the jurors, you said you knew it was the beginning of June because of your mother's birthday.

[Perkins]: I'm going to object. That mischaracterizes what she said. She said "I believe." So even if she answered it from your Honor's reading of the question, she didn't say it with certainty. She did say she believes.

[State]: And she used her mother's birthday as a benchmark as to why she thought that. Correct?

[Woods]: Also, I had said –

[Court]: Is that correct? Did you - you did say that; didn't you?

[Woods]: I believe that it was in the beginning of June, toward the early part of June.

[Court]: Okay.

[Woods]: My mom's birthday is in the early part of June.

[Court]: Okay.

[State]: But when I asked you earlier this morning when it happened, you said the end of June, June 30th.

[Woods]: You asked me a numerous amount of questions – where did I go, when did I do it –

[State]: I'm asking –

[Woods]: (Continuing) – was it finalized, what happened.

[State]: Your Honor.

[Woods]: And I was confused. You tried to confuse me.

[State]: Your Honor, could you instruct the witness to simply answer the questions that are asked, please.

| [Court]: | I have instructed the witness, her attorney has instructed the witness; the witness is not going to cooperate. I do have a solution for that. |
| --- | --- |
| [State]: | Okay. Well, let me – may I just finish? |
| [Court]: | Yes, please, finish your questions. |

*Id.* at 179-81.

[58]     Woods argues the trial court's implicit threat to hold her in contempt, which was stated in the jury's presence, went beyond mere irritation and demonstrated prejudice against her. We disagree. Although the court may have been irritated, irritation alone does not demonstrate bias in light of Woods' repeated failure to comply with the rules of evidence. By the time the court admonished Woods in the jury's presence, Woods had repeatedly attacked other witnesses and discussed hearsay despite repeated direction from her counsel and the court to avoid those subjects. She also argued with the prosecutor on the stand. The court's admonition to Woods outside the presence of the jury did not seem to change her behavior. We view the court's implied threat to hold Woods in contempt as a reasonable measure that was necessary to control the courtroom because prior measures were ineffective.

[59]     Finally, Woods argues the court's statements and conduct, when viewed cumulatively, demonstrate bias. We disagree. The doctrine of hearsay can be difficult for nonlawyers to grasp, and much of the evidence in this case depended on what Woods and her family members said during conversations. Further, cross-examination can produce testy exchanges. Nevertheless, Woods, alone among all the witnesses who testified at this lengthy trial, demonstrated a

particular inability to avoid repeating hearsay and arguing with opposing counsel, despite repeated instructions from the court and counsel on how to conduct herself on the stand. We cannot conclude the court's attempts to maintain an orderly trial demonstrated bias or fundamental error. *See Rowe*, 539 N.E.2d at 477 (trial court's repeated interjections during trial individually and in the aggregate did not show bias but rather represented an "evenhanded" approach to keep the trial moving).

## C. Woods' Motion for Mistrial

[60] Woods argues the trial court should have granted her motion for mistrial after a juror's statements allegedly tainted the jury against her. An impartial jury is the cornerstone of a fair trial, guaranteed by the Sixth Amendment and article 1, section 13 of the Indiana Constitution. *Ramirez v. State*, 7 N.E.3d 933, 936 (Ind. 2014). A mistrial is an extreme remedy that is only justified when other remedial measures are insufficient to rectify a situation. *Mickens v. State*, 742 N.E.2d 927, 929 (Ind. 2011). A trial court is in the best position to evaluate whether a mistrial is warranted because it can assess first-hand all relevant facts and circumstances and their impact on the jury. *Ramirez*, 7 N.E.3d at 935. We therefore review the denial of a motion for mistrial only for abuse of discretion. *Id.* However, the correct legal standard for a mistrial is a pure question of law, which we review de novo. *Id.*

[61] Defendants seeking a mistrial for suspected jury taint are entitled to the presumption of prejudice only after making two showings, by a preponderance

of the evidence: (1) extra-judicial contact or communications between jurors and unauthorized persons occurred; and (2) the contact or communications pertained to the matter before the jury. *Id.* at 939. If a defendant fails to make the initial two-part showing, the presumption does not apply. *Id.* If the defendant makes the two-part showing, the burden then shifts to the State to rebut this presumption of prejudice by showing that any contact or communications were harmless. *Id.*

[62] Here, on the morning of the fourth day of trial, Juror 108 sent a note to the trial judge explaining that he needed to be dismissed from the jury because he was in fear for his life. During a discussion involving the court and the parties, the court explained that the bailiff had told the court Juror 108 had seen members of Woods' family outside the courthouse the prior evening while waiting for a ride. There was no interaction or contact. Juror 108 had also reported to the bailiff that he was nervous about waiting for the bus on his way to and from the courthouse.

[63] Next, the court and the parties questioned Juror 108 outside the presence of the other jurors. Before the questioning, both parties indicated they wanted to try to keep him on the jury, if possible. When questioning began, the juror stated, "If I have to go to jail, I'll go to jail for three days or whatever. I'm not going to serve on this jury." Tr. Vol. 6, p. 20. He explained that he and his family lived in the same neighborhood as members of Woods and Pops' family. Juror 108 further explained he had discussed the case with his family, and his family told him Woods and Pops' family members were very dangerous and he should get

off the case. He said, "I fear for my life." *Id.* at 22. Juror 108 also said he had been "watched" by Woods' family the previous evening while waiting for a ride. *Id.* at 24. He conceded that no one had contacted his family yet, but he was worried. The court noted Juror 108 was visibly shaking and afraid.

[64] Juror 108 further explained to the court and the parties that he had told all his fellow jurors that morning that he wanted off the case because he feared for his safety. The court paused the questioning to talk with the parties, sending Juror 108 to the bailiff's office to keep him separated from other jurors. During the break in questioning, Woods asked for a mistrial. The court declined to rule on that request at that time.

[65] When the court brought Juror 108 back into the courtroom for further questioning, he said Woods' family and "affiliates" were "very cruel" and "extremely, extremely dangerous." *Id.* at 46. He further explained that when he arrived that morning, he waited until his fellow jurors were assembled before telling them he needed to leave the jury because he feared for his safety. Juror 108 explained to them that he's the only one who was "really vulnerable" because he lived in the same neighborhood as Woods' family. *Id.* at 50.

[66] After the questioning ended and Juror 108 left the courtroom, Woods renewed her motion for mistrial. The court took the motion under advisement. The court further decided to question each of the jurors, individually, under oath, and put the jurors who had been questioned in a different room from the jurors who had yet to be questioned.

[67]     During questioning, the court asked each juror what he or she had heard from Juror 108 that morning and if that would affect his or her ability to decide the case fairly. Most of the jurors had heard Juror 108 say he was afraid for his safety. Some also said Juror 108 reported that his son told him about the people involved in the case. Others said Juror 108 explained he was afraid because he takes public transportation and lives in the same area as Woods' family. Several jurors said they were a little concerned for their safety based on Juror 108's statements, but none of them were so scared that they wanted to be released from the jury. All of the jurors said that they could still be impartial despite Juror 108's statements. Three of them said they thought Juror 108 was being overly dramatic about the situation.

[68]     After the jurors were questioned, Woods renewed her motion for mistrial. Woods argued, and the prosecutor conceded, that extra-judicial contact or communications between jurors and unauthorized persons had occurred, and the communications pertained to the case. As a result, the State was obligated to rebut a presumption of prejudice. The prosecutor argued the presumption was rebutted because the jurors said they could remain impartial. The court agreed with the State and denied the motion for mistrial. Woods requested that the court admonish the jury, and the court instructed the jury as follows:

> You each were interviewed and indicated that you felt no impact about Mr. – Juror No. 108's request to be allowed to leave the jury and that you could still be fair and impartial. I want to remind you that if at any point that changes, please let us know, and during your deliberations you're not to give any weight to

the fact that he felt – that he needed to be released from this jury to your deliberations, okay?

And once again, I want to remind you please do not talk to anybody about this case. Now, I don't know how much you said to your family. Certainly they have to know what you're doing every day, but they don't – if they don't know the name of the case that you're on, don't tell them the name of the case because they're going to be reading the newspaper and they're going to see, you know, that you're not reading the newspaper, but they're going to see that you're on this – that if you – that this case is in the paper and that you know something about it. So if they don't know the name of the case that you're sitting on, please don't tell them, and if they already know, then please do not discuss any matters with them, your family, friends, or anybody else. That's just imperative.

Tr. Vol. 6, pp. 139-40.

[69]    We cannot conclude the trial court erred in denying Woods' motion for mistrial. Although there was an extra-judicial communication with Juror 108 about the case, and Juror 108 told his fellow jurors about his fears, Juror 108's comments did not prejudice the jury. Each of the jurors stated he or she would be impartial despite Juror 108's statements. The trial court was best positioned to view the jurors and assess their credibility. Further, the trial court instructed the jurors not to give any weight to Juror 108's removal from the jury. The extreme remedy of a mistrial was unnecessary here. *See Weisheit v. State*, 26 N.E.3d 3, 16 (Ind. 2015) (trial court did not err in denying defendant's motion for mistrial; one of juror's spouses wrote a note to jurors about case, but trial court interviewed jurors separately, and jurors who had read note said it would not affect their ability to serve impartially).

# Conclusion

[70] For the reasons stated above, we affirm the judgment of the trial court.

[71] Affirmed.

Najam, J., and Barnes, J., concur.