## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 06 2020, 7:34 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Suzy St. John
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Benjamin J. Shoptaw
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

David C. Rojas,
*Appellant-Defendant,*

v.

State of Indiana,
*Appellee-Plaintiff.*

February 6, 2020

Court of Appeals Case No.
19A-CR-1184

Appeal from the Marion Superior Court

The Honorable Lisa F. Borges, Judge

Trial Court Cause No.
49G04-1707-MR-24646

**Najam, Judge.**

# Statement of the Case

David C. Rojas appeals his conviction for murder, a felony. Rojas raises two issues for our review, which we revise and restate as follows:

1. Whether the trial court committed fundamental error when it failed to act upon instances of prosecutorial misconduct during the State's closing argument at trial.

2. Whether the trial court acted improperly and, thus, committed fundamental error when it instructed the jury.

We affirm.

# Facts and Procedural History

In February 2017, Rojas was living with his friend and co-worker, Abel Campos. On the evening of February 17, Campos and Rojas were drinking at Campos' apartment. At around 9:00 p.m., Jose Garcia-Lopez joined the men, and the three of them drank "two to three cases" of beer throughout the night. Tr. Vol. III at 7. At around 12:30 or 1:00 a.m. on the 18th, Campos went upstairs to go to sleep, and Rojas and Garcia-Lopez remained downstairs and continued to drink.

Thereafter, at approximately 3:00 a.m., Rojas went into Campos' bedroom and woke Campos up. Campos felt "threatened" by Rojas because Rojas had a knife, so he went downstairs. Tr. Vol. II at 240. Campos saw Garcia-Lopez, who appeared to be dead, "wrapped in a tarp." *Id.* Rojas then asked if Campos would help throw Garcia-Lopez's body in the dumpster. Campos complied

because he felt that Rojas "would hit" him if he did not help. *Id*. at 242. After the men disposed of Garcia-Lopez's body, Campos went back upstairs inside his apartment and went to sleep.

[5] Later that morning, Garcia-Lopez's fiancée, Melissa Bershell, woke up to discover that Garcia-Lopez had not returned home. She attempted to call Garcia-Lopez, but his phone was "shut off." *Id*. at 112. At around 7:30 a.m., Bershell and her friend, Priscilla Provincial, went to Campos' apartment to look for Garcia-Lopez. When Bershell and Provincial arrived at Campos' apartment, Campos and Rojas were standing outside drinking beer. Provincial then went into Campos' apartment. Provincial noticed that the apartment was "disgusting," and "there w[ere] cockroaches everywhere[.]" *Id*. at 128. However, the apartment smelled strongly of "a cleaning type of smell." *Id*. While she was in the apartment, Provincial noticed that Rojas was "jittery," and he was "[p]acing back and forth," which was "odd." *Id*.

[6] After Bershell and Provincial left the apartment, Bershell and Campos went to McDonalds, and Provincial sat outside drinking beer. When Provincial finished one of her beers, she walked over to the dumpster to throw the beer can away. Provincial saw that there was "blood on the dumpster" and that there was a knife blade on the ground. *Id*. at 132. Provincial called Bershell, who had returned from McDonalds and was at the apartment's main office, and told Bershell about the blood.

[7] After she talked to Provincial, Bershell approached Detective Charles King with the Indianapolis Metropolitan Police Department, who was at the office for an unrelated reason. Detective King accompanied Bershell to the dumpster. Detective King observed that "there was a substantial amount of blood around the dumpster" and "what appeared to be a kitchen knife blade on the ground." *Id.* at 136. At that point, Detective King looked in the dumpster and started "[m]oving things." *Id.* at 137. Detective King saw a pair of jeans that "were in fairly good condition" but that "smelled very strongly of bleach." *Id.* Detective King also observed "what appeared to be a person's knee" in the dumpster. *Id.* Officers then discovered Garcia-Lopez's body. And officers observed a "possible blood trail" that led from the dumpster to Campos' apartment. *Id.* at 144. At that point, officers took Rojas and Campos into custody and collected DNA samples from them. Officers also took possession of their shoes, which had blood on them.

[8] Officers then searched Campos' apartment. There, officers found a white sweatshirt on the couch that had a blood stain on the sleeve. Officers also found a utility knife that had Rojas' fingerprint on it. And officers found a trashcan in the apartment that had bloodstains on it. A crime scene specialist then swabbed the dumpster, the knife blade, the jeans, the sweatshirt, the trashcan, and Rojas' and Campos' shoes to be tested for DNA. The crime scene specialist also swabbed the inside of the jeans and the sweatshirt in order to "determine who the possible wearer may have been." Tr. Vol. III at 66.

[9] Thereafter, on February 20, the coroner performed an autopsy on Garcia-Lopez. Doctor Christopher Poulos, a forensic pathologist, reviewed the coroner's report.[1] Dr. Poulos noted that Garcia-Lopez had "a lot more external injuries then [he] can talk about." *Id*. at 214. Those injuries included "multiple" blunt and sharp force injuries that were located "primarily" in the head and chest. *Id*. at 212. Dr. Poulos also observed several stab wounds, including a stab wound that severed the carotid artery. Based on Garcia-Lopez's injuries, Dr. Poulos concluded that his death was a homicide. *Id*. at 222.

[10] Shelly Crispin, the DNA technical manager at the Indianapolis Marion County Forensic Services Agency, tested the swabs that the crime scene specialist had prepared. Crispin concluded that the blood stain on the ground in front of the dumpster contained both Garcia-Lopez's and Rojas' DNA. Crispin was also able to determine that the DNA from the knife blade found in front of the dumpster matched Garcia-Lopez's DNA. As for the jeans located in the dumpster, Crispin determined that the DNA from "multiple" blood stains on the outside of the jeans matched Garcia-Lopez's DNA. Tr. Vol. III at 67. And Crispin concluded that the DNA from the "inside of the knee area of the pants" matched Rojas' DNA. *Id*. at 66.

---

[1] During the pendency of the case, the coroner moved to another state.

[11] Crispin also determined that a blood stain on the sleeve of the white sweatshirt contained Garcia-Lopez's DNA. And Crispin concluded that the DNA from the inside of the sweatshirt matched Rojas' DNA. Crispin then tested the blood stain on the trash can. Crispin could not exclude Rojas as a contributor, but she "excluded" Garcia-Lopez and Campos as possible contributors. *Id*. at 62. Crispin then tested the blood stains on Rojas' and Campos' shoes. She determined that the blood stains on both men's shoes matched Garcia-Lopez' DNA

[12] The State charged Rojas with murder, a felony.[2] The trial court held a jury trial on April 8 and April 9, 2019. In his opening statement, Rojas argued to the jury that Compos was not a credible witness and that his testimony would raise serious doubts as to his version of the events. During the trial, the State presented Campos' testimony as evidence. After Campos testified, the court held a hearing on the final jury instructions. During that hearing, the following colloquy occurred:

> THE COURT: I assume there's no need for accomplice liability?
>
> [The State]: I don't think so.

---

[2] The State also charged Campos with murder, a felony. However, Campos and the State entered into a plea agreement in which Campos agreed to plead guilty to assisting a criminal, as a Level 5 felony, in exchange for testifying at Rojas' trial. The trial court accepted Campos' plea, entered judgment of conviction accordingly, and sentenced him to six years in the Department of Correction. *See* Tr. Vol. III at 5.

THE COURT: Okay. I'm just—let me rephrase that. Is there a need for [an] accomplice liability instruction?

[The State]: I mean, actually I mean, it's possible that they could decide that both of them did it and maybe it's a good idea to instruct them in that case what the law is.

\* \* \*

[Rojas]: I guess in summary Judge, I guess based on the evidence that the State has presented, their case is—they haven't presented any evidence [that] this is an accomplice situation. The State's case is that one person killed Mr. Garcia.

THE COURT: And you're not going to argue that it was Mr. Campos, are you?

[Rojas]: And that's obviously the case that we're going to argue, but the State kind of by virtue of how they decided to proceed with this case—

[The State]: Well, and I think we're going to argue and even if Mr. Campos isn't telling the truth and participated more than he says, that doesn't make the other person not guilty, in which case we're talking about accomplice liability type of situation.

THE COURT: That's just what I was thinking.

\* \* \*

THE COURT: . . . But I do think the evidence supports, that's been given thus far, may support an accomplice liability theory as well. Or I think it does, not may.

*Id.* at 23-24. The State then asked the court to instruct the jury on accomplice liability. Rojas objected to that instruction on the ground that it did not "match[] the State's theory of the case[.]" *Id.* at 25. The court stated that the instruction is "a correct statement of law" and that it believed "that it is an issue in the case, that the jurors may have a question about[.]" *Id.* at 30. Accordingly, the court overruled Rojas' objection and agreed to instruct the jury on accomplice liability.

[13] After the parties had concluded the presentation of evidence, they gave their closing arguments. During Rojas' closing argument, Rojas argued that the jury could not believe Campos' testimony because it contained numerous inconsistencies. In its rebuttal closing argument, the State argued that any inconsistencies in Campos' testimony could be explained by the fact that he was testifying through an interpreter. At the conclusion of the trial, the jury found Rojas guilty of murder, a felony. The trial court entered judgment of conviction accordingly and sentenced Rojas to sixty years in the Department of Correction. This appeal ensued.

## Discussion and Decision

### *Issue One: State's Closing Argument*

[14] Rojas first contends that the trial court committed fundamental error during the State's closing argument at trial. The prosecutor stated in relevant part as follows:

We can fight all day about what Abel Campos said or didn't say. He's testifying through a language barrier. I don't know what to say to him in Spanish. He said upset, upset, upset. I said, do you mean angry. He said yes, angry. Did you go to a restaurant, he was asked by [Rojas] at one point. Hey, did you go to any restaurants? We got a no. More specifically asked, do you recall going to a McDonalds. We got a yes. He doesn't speak English. He's testifying through someone else, relying on the person who's standing here, hopefully translating things correctly. There's such things as lost in translation. There's a movie titled *Lost in Translation*. That's a saying. Things get lost in translation.

*Id*. at 92-93. Rojas maintains that the prosecutor's reference to Campos' testimony getting lost in translation "undermined the integrity of our justice system," was unsupported by any evidence, and improperly bolstered Campos' testimony. Appellant's Br. at 21. Rojas also asserts that the prosecutor improperly vouched for Campos when the prosecutor told the jury during closing argument that Campos "told you the truth." Tr. Vol. III at 84. And Rojas contends that those statements constituted prosecutorial misconduct.

[15]   As our Supreme Court has explained,

[i]n reviewing a claim of prosecutorial misconduct properly raised in the trial court, we determine (1) whether misconduct occurred, and if so, (2) "whether the misconduct, under all of the circumstances, placed the defendant in a position of grave peril to which he or she would not have been subjected" otherwise. A prosecutor has the duty to present a persuasive final argument and thus placing a defendant in grave peril, by itself, is not misconduct. "Whether a prosecutor's argument constitutes misconduct is measured by reference to case law and the Rules of Professional Conduct. The gravity of peril is measured by the

probable persuasive effect of the misconduct on the jury's decision rather than the degree of impropriety of the conduct." To preserve a claim of prosecutorial misconduct, the defendant must—at the time the alleged misconduct occurs—request an admonishment to the jury, and if further relief is desired, move for a mistrial.

*Ryan v. State*, 9 N.E.3d 663, 667 (Ind. 2014) (citations omitted).

Here, Rojas did not object to the prosecutor's statements during closing argument. Thus, to prevail on appeal, Rojas

> must establish not only the grounds for prosecutorial misconduct but must also establish that the prosecutorial misconduct constituted fundamental error. Fundamental error is an extremely narrow exception to the waiver rule where the defendant faces the heavy burden of showing that the alleged errors are so prejudicial to the defendant's rights as to "make a fair trial impossible." In other words, to establish fundamental error, the defendant must show that, under the circumstances, the trial judge erred in not *sua sponte* raising the issue because alleged errors (a) "constitute clearly blatant violations of basic and elementary principles of due process" and (b) "present an undeniable and substantial potential for harm." The element of such harm is not established by the fact of ultimate conviction but rather "depends upon whether [the defendant's] right to a fair trial was detrimentally affected by the denial of procedural opportunities for the ascertainment of truth to which he otherwise would have been entitled."

*Id*. at 667-68 (citations and footnote omitted). In evaluating the issue of fundamental error, our task is to look at the alleged misconduct in the context of all that happened and all relevant information given to the jury—including

evidence admitted at trial, closing argument, and jury instructions—to determine whether the misconduct had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *See id*.

[17] On appeal, Rojas contends that the trial court committed fundamental error when it did not "act[] *sua sponte* to mitigate" the errors in the prosecutor's statements because those statements "went straight to the very heart of the issue the jury was asked to decide—whether Campos testified truthfully about Rojas's role in the murder of Garcia-Lopez." Appellant's Br. at 26-27. In essence, Rojas contends that the prosecutor's statements during closing arguments "invaded the province of the jury to determine witness credibility in a case without overwhelming proof of Rojas as the murderer," which Rojas contends "denied [him] a fair trial." *Id*. at 28. We cannot agree.

[18] Even assuming that the prosecutor's statements were improper, we cannot say that they amounted to fundamental error. In addition to the challenged statements, the prosecutor also told the jury: "Even if you think Abel Campos did more than he admitted to, that doesn't make David Rojas any less guilty." Tr. Vol. III at 85. The prosecutor also argued that the case against Rojas "isn't based on Abel Campos telling us anything." *Id*. at 91. The prosecutor further told the jury that it should "question the integrity" of Campos and that Campos is only "a small piece of the puzzle. He only confirms things we already know based on what we can tell from all the physical evidence about who was involved." *Id*. at 92. And the prosecutor stated to the jury that it was "entitled to believe" that Campos "isn't telling you the whole truth." *Id*. at 95. In other

words, while the prosecutor argued that Campos told the jury the truth and that any inconsistencies in his testimony could be explained by the fact that his testimony was translated, the prosecutor also told the jury that it should question Campos' integrity and that it could decide that Campos was not telling the truth.

[19] Further, the court instructed the jury that "[w]hen the evidence is completed the attorneys may make final arguments. These final arguments are not evidence. The attorney's [sic] are permitted to characterize the evidence, discuss the law, and attempt to persuade you to a particular verdict. You may accept or reject those arguments as you see fit." Tr. Vol. II at 102. The court also instructed the jury as follows: "You are the exclusive judges of the evidence, which may be either witness testimony or exhibits." *Id*. at 100. And the court instructed the jury that "[s]tatements made by the attorneys are not evidence," and "[y]our verdict should be based on the law and the facts as you find them." Tr. Vol. III at 99.

[20] Under those circumstances, we cannot say that the prosecutor's statements during closing argument that some of Campos' testimony was lost in translation or that Campos was telling the truth had such an undeniable and substantial effect on the jury's decision that a fair trial was impossible. *See Ryan*, 9 N.E.3d at 668. Accordingly, the trial court did not commit fundamental error during the State's closing argument.

[21] Rojas next contends that the trial court demonstrated bias when it instructed the jury. It is well settled that the law "presumes that a judge is unbiased and unprejudiced." *Woods v. State*, 98 N.E.3d 656, 664 (Ind. Ct. App. 2018), *trans. denied*. Judges require broad latitude to run their courtrooms and to maintain discipline and control. *See id*. A defendant asserting judicial bias "must show that the trial judge's actions and demeanor showed partiality and prejudiced the case." *Id*. "If a judge is biased, fundamental error exists because trial before an impartial judge is an essential element of due process." *Id*.

[22] On appeal, Rojas contends that the trial court demonstrated bias and, thus, committed fundamental error when it instructed the jury on accomplice liability.[3] Specifically, Rojas asserts that the trial court "encourag[ed]" the State to ask for that jury instruction even though the evidence did not support giving the instruction, which was "tantamount" to the court expressing its opinion that "the case against [Rojas] would be stronger if the jury had the option to convict him as an accomplice." Appellant's Br. at 33, 34. In other words, Rojas contends that the trial court demonstrated bias against him when it persuaded the State to ask for a jury instruction that was not supported by the evidence.[4]

---

[3] Rojas did not object to the jury instruction on the ground of bias. Rather, Rojas only objected on the ground that that instruction did not "necessarily match[] the State's theory of the case[.]" Tr. Vol. III at 25.

[4] To the extent Rojas contends that the court acted partially when it in essence *sua sponte* raised the issue of an accomplice liability jury instruction, we cannot agree. The Indiana Rules of Criminal Procedure explicitly allow a court to give jury instructions "on its own motion." Ind. Crim. Rule 8(A).

But we hold that the court did not commit any error, let alone fundamental error, when it instructed the jury.

[23] It is well settled that the purpose of jury instructions "is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict." *Phillips v. State*, 22 N.E.3d 749, 761 (Ind. Ct. App. 2014) (quoting *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010)). In reviewing a trial court's decision to give a tendered jury instruction, we consider whether the instruction correctly stated the law, is supported by the evidence in the record, and is not covered in substance by other instructions. *See id.*

[24] Indiana's accomplice liability statute provides that a person "who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense." Ind Code. § 35-41-2-4 (2019). Under that statute, "an individual who aids another person in committing a crime is as guilty as the actual perpetrator." *Schaaf v. State*, 54 N.E.3d 1041, 1043 (Ind. Ct. App. 2016). Here, at the time the court discussed the accomplice liability statute, the State had not yet presented any DNA evidence. Accordingly, Rojas argues that the only evidence that had been admitted showed that "Rojas acted alone in the murder" and that there was no evidence to demonstrate that he had aided, induced, or caused another person to commit the offense. Appellant's Br. at 35.

[25] However, when the State asked for the jury instruction, the evidence demonstrated that one night, Rojas, Campos, and Garcia-Lopez drank at

Campos' apartment, which was where Rojas was living at the time. And the evidence showed that, sometime during that night, Garcia-Lopez was murdered. Further, the State had presented Provincial's testimony that Campos' apartment was "disgusting" but smelled strongly of "a cleaning type of smell." Tr. Vol. II at 128. And Provincial testified that Rojas was acting "jittery" and "odd" while she was in the apartment. *Id*. at 129. In addition, there was a blood trail leading from Campos' apartment to the dumpster where Garcia-Lopez' body was found, and officers collected several items with blood stains from inside of Compos' apartment. In addition, the State presented evidence that Garcia-Lopez had been stabbed and that Rojas' fingerprint was found on a utility knife officers had located in a trashcan in the apartment. And, when Campos and Rojas were arrested, both men had blood on their shoes.

[26] Further, the State presented Campos' testimony that Rojas had murdered Garcia-Lopez and that he had simply helped dispose of the body. But the State also presented evidence that it had initially charged Campos with murder but that Campos pleaded guilty to assisting a criminal in exchange for testifying at Rojas' trial. Based on that evidence, a reasonable jury could infer that Campos had done more than simply help dispose of the body and that Rojas had aided Campos in murdering Garcia-Lopez. Accordingly, we agree with the trial court that the issue of accomplice liability was "an issue in the case" and that the jurors "may have [had] a question about" it. Tr. Vol. III at 30. The court therefore properly informed the jury of the law applicable to the facts. *See*

*Phillips*, 22 N.E.3d at 761. Because the evidence supported instructing the jury on accomplice liability, we cannot say that the court demonstrated any bias against Rojas when it gave that instruction. The trial court therefore did not commit fundamental error on this issue.

[27] In sum, the trial court did not commit fundamental error during the State's closing argument. And the trial court did not demonstrate bias when it instructed the jury. We therefore affirm Rojas' conviction.

[28] Affirmed.

Vaidik, J., and Tavitas, J., concur.