**Jerray FRANKLIN, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 45S00–9809–CR–517.

Supreme Court of Indiana.

Sept. 8, 1999.

James F. Stanton, Crown Point, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Arthur Thaddeus Perry, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

BOEHM, Justice.

Jerray Franklin was convicted of the murder of his five-month-old son, Jerray Franklin II, the attempted murder of Eric Foster, the battery of Autumn Turner, and residential entry. He was sentenced to enhanced and consecutive sentences totaling 125 years. In this direct appeal he contends that (1)

there was insufficient evidence to support his murder conviction; (2) the trial court committed fundamental error when it failed to instruct the jury on circumstantial evidence; and (3) his 125 year sentence is manifestly unreasonable. We affirm the trial court.

### Factual and Procedural Background

Jerray Franklin and Autumn Turner were the parents of Jerray Franklin II, who was born on March 12, 1997. The three resided with Autumn's stepfather, Chester Turner, until August 12, 1997, when Autumn and the five-month-old baby moved out. During the next few days Franklin attempted to locate Autumn and the baby and expressed his anger at her departure. In the early morning hours of August 15, he looked in the windows of Eric Foster's home and found Autumn and Foster naked in bed. Franklin entered the house through an open window and saw the baby asleep on a living room sofa. He then went to the bedroom, where Foster awoke to see Franklin standing in the doorway of his bedroom. Foster rose from the bed, approached Franklin, saw that Franklin had a gun, raised his hand, and was shot in the hand by Franklin. Foster then pushed his way past Franklin and ran through the house towards the basement. Franklin pursued, firing three more shots that struck Foster in both legs and also grazed his side. Franklin then turned back toward the bedroom. Autumn had locked the bedroom door, but Franklin kicked it in. After the two talked briefly, Franklin shot Autumn once in the knee. He then kicked and punched her and struck her several times in the head with the gun. Finally, Franklin went to the living room where he picked up the baby, told Autumn that she was never going to see the child again, and fled. The baby's body was found by police in Chester's freezer two days later. On top of the baby was a note from Franklin to Autumn in which Franklin apologized for "all the trouble [he] caused" and stated that "little Jerray died in his sleep."

Franklin was charged with the murder of Jerray II, the attempted murder of Autumn and Foster, two counts of battery as a Class C felony for shooting Autumn and Foster, and residential entry. The jury found Franklin not guilty of the attempted murder of Autumn and guilty of the remaining counts. The trial court merged the battery conviction relating to Foster with the attempted murder count. Franklin was sentenced to enhanced and consecutive terms totaling 125 years imprisonment.[1]

### I. Sufficiency of the Evidence for Murder

Franklin first contends that there is insufficient evidence to support the jury's verdict that he knowingly or intentionally killed his son. He does not challenge the sufficiency of the evidence to support any of the remaining counts. Specifically, Franklin points to his post-arrest statement to police and his trial testimony in which he denied that he intentionally caused any injury to his son. In his statement to police, Franklin stated that he dropped the baby when he jumped over a fence after leaving Foster's home. According to Franklin, the baby fell onto "concrete or gravel" and started crying but was not bleeding and "it did not look like he had a bruise or nothing." Franklin then secured a ride from a man in a truck and spent Friday in an abandoned building with the baby. That evening Franklin took the baby to Chester's house where he climbed through a window and secured baby food and diapers. Franklin spent Friday evening in an abandoned house beside Chester's residence. According to Franklin, he fed the baby a juice bottle and some milk, and the baby started crying after Franklin changed his diaper. Franklin wrapped the baby in his coat because he thought the baby was cold and put him in a closet to sleep. Franklin went to another part of the abandoned house where he fell asleep. When he woke up and went to the closet to check on the baby, the baby was "real warm" and "it looked like he had spit up milk or something." Because the baby "was not moving or breathing," Franklin attempted CPR but was unsuccessful in resuscitating the baby. Because he was unable to contact Autumn but thought that he should "be the one to tell

---

1. Franklin was sentenced to sixty-five years for murder, forty-nine years for attempted murder, eight years for battery, and three years for residential entry.

her," he wrote a note "apologizing for everything" and laid the baby on Chester's bed. Franklin returned to Chester's house the next day, saw that no one had found the baby, and then put the baby in the freezer "so his body would not decompose." Franklin offered essentially the same version of events when he testified at trial.

The State responds by pointing to Franklin's prior statements regarding the baby and the testimony of a pathologist. On the day before Franklin discovered Autumn at Foster's house, he spoke to Foster at Michael Harbin's house. According to Foster, Franklin asked if Foster knew where Autumn was, stated that she had left with the baby and he was angry about it, and told Foster "if he wanted to be bad he could blow up the house and her and the baby." Harbin testified that Franklin told him that if he and Autumn separated, "he'd see to it that she suffered for the rest of her life." Franklin also told Harbin "something like if I can't have my son around me, then nobody will be able to have my son." Finally, Autumn testified that, immediately before Franklin abducted the baby, he "said something about ... that he was gonna take the baby and I'll never get to see him again."

The State also presented the testimony of a forensic pathologist who had reviewed several pictures from the autopsy and the autopsy report. He testified that Jerray II "died as a result of blunt force injuries of the head and chest, which resulted in multiple skull fractures and contusion of the chest and heart." He further explained the injuries as:

all of those areas where the skull came together were torn apart, so that the fibrous tissue was torn; but even more important, there was fractures of the base of the skull. So, the bottom portion of the skull, which is ordinarily fairly well fused together, was broken as well. The brain was extensively swollen as a result of this blunt force injury, which was accomplished to a major degree by extreme compression of the skull, so that the blunt force is likely to have been applied over a short period of time.... The injury of the skull if more similar to the extensive pressure of one body, such as a body of an adult, pressing

down on the skull in a very violent way. The contusion and injury of the heart came about in pretty much the same fashion.

The pathologist opined that, although these injuries could have been followed by a "very brief cry," the crying would not have sustained "and from that moment there would be complete unconsciousness until death."

The pathologist's testimony conflicted with Franklin's in several respects. The pathologist testified that the baby's injuries were not the product of a fall from four feet, but rather would have required a fall

from a much greater height, possibly as high as 15 to 20 feet or a force that's augmented by the weight of the body of another person falling against the infant, compressing the head. A fall of four feet could possibly do that, but it would have to be augmented with the weight of the body of another human being.

Franklin told police that the baby had fallen onto concrete or gravel while Franklin was going over a fence, but the pathologist testified that there were no scrapes on the baby. After listening to the pathologist's trial testimony Franklin offered a somewhat different account at trial, telling the jury that "it was like my hand had hit the concrete and [the baby] was still like towards in my hand." The pathologist also testified that a baby who had sustained these severe injuries would not have been crying hours later as Franklin stated, nor would it be able to consume milk or juice. In addition, the pathologist testified that, had the baby sustained its injuries during Franklin's flight from Foster's home during the early morning hours of August 15, the baby would not have survived until the following morning as Franklin claimed. Finally, Franklin told the police and testified at trial that he unsuccessfully attempted CPR on Jerray II. The pathologist testified on cross-examination that the chest injuries could have been caused by an unskilled person attempting to perform CPR, but on redirect stated that the "great force" required to inflict the chest injuries would not normally be seen from a parent who tried CPR on an infant of that age.

The jury was instructed that, to find Franklin guilty of murder, it must find

beyond a reasonable doubt that he knowingly or intentionally killed Jerray II. It found that the State had met this burden, and its assessment of the evidence is entitled to deference on appeal. Franklin's sufficiency challenge is little more than a request to view the evidence most favorable to his acquittal and to draw inferences that support that result.[2] Our well settled standard of review precludes us from doing this. We do not reweigh evidence or assess the credibility of witnesses. Rather, we look to the evidence and reasonable inferences drawn therefrom that support the verdict and will affirm the conviction if there is probative evidence from which a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Garrett v. State*, 714 N.E.2d 618, 621 (Ind. 1999); *Taylor v. State*, 681 N.E.2d 1105, 1110 (Ind.1997). A murder conviction may be based entirely on circumstantial evidence. *Kriner v. State*, 699 N.E.2d 659, 663 (Ind. 1998); *Taylor v. State*, 676 N.E.2d 1044, 1047 (Ind.1997). Circumstantial evidence will be deemed sufficient if inferences may reasonably be drawn that enable the trier of fact to find the defendant guilty beyond a reasonable doubt. *Kriner*, 699 N.E.2d at 663.

In short, the State presented evidence that Jerray II died as the result of severe injuries to the head and chest. These injuries were inflicted between the time that Franklin abducted the child from Foster's home and the point at which he placed the dead baby in Chester's home. Franklin, according to his own account of events, was with the baby throughout this period of time, and there is no suggestion that anyone else inflicted the injuries. Although Franklin offered a version of events that suggested the death was the result of an accidental fall and that the baby died the following day while Franklin slept, this account was at odds with the medical evidence in many respects. Based on

Franklin's prior threats and the pathologist's testimony, there is sufficient evidence of probative value from which the jury could have concluded that Franklin knowingly or intentionally killed Jerray Franklin II.

## II. Jury Instruction

Franklin argues that the trial court erred when it failed to instruct the jury that "circumstantial evidence must exclude every reasonable hypothesis of innocence beyond a reasonable doubt." He concedes that he did not tender an instruction on circumstantial evidence at trial and did not object to the trial court's failure to give one sua sponte. This ordinarily results in waiver of the issue on appeal. *Bunch v. State*, 697 N.E.2d 1255, 1257 (Ind.1998) (citing *Sanchez v. State*, 675 N.E.2d 306, 308–09 (Ind.1996)). Although Franklin attempts to overcome procedural default by asserting that the trial court's omission constitutes "fundamental error," we have held that it does not. *See Bunch*, 697 N.E.2d at 1257; *Whatley v. State*, 685 N.E.2d 48, 49–50 (Ind.1997).

## III. Reasonableness of the Sentence

As a final point, Franklin contends that his 125 year sentence is manifestly unreasonable. Although this Court has the constitutional authority to review and revise sentences, IND. CONST. art. VII, § 4, it will not do so unless the sentence imposed is "manifestly unreasonable in light of the nature of the offense and the character of the offender." Ind. Appellate Rule 17(B). The Court has explained this standard as "not whether in our judgment the sentence is unreasonable, but whether it is clearly, plainly, and obviously so." *Prowell v. State*, 687 N.E.2d 563, 568 (Ind.1997), *cert. denied*, — U.S. —, 119 S.Ct. 104, 142 L.Ed.2d 83 (1998).[3]

---

2. For example, Franklin points to evidence that he had fed the baby and changed its diapers. He contends that "[i]t is not likely nor reasonable that a man intent on killing his child would feed the child and change his diapers." Although this evidence may suggest that Franklin did not intend to kill the baby immediately, the possibility that he knowingly or intentionally killed the child at some later point in time is quite reasonable and is supported by the other evidence.

3. Citing Appellate Rule 17(B), the State contends that "a sentence is not manifestly unreasonable unless no reasonable person could find the sentence appropriate to the offense and offender." The "no reasonable standard," which once appeared as Appellate Rule 17(B)(2), was deleted effective March 1, 1997, and is no longer the proper standard for the appellate review of sentences under Rule 17(B).

The nature of Franklin's offenses is severe and troubling. He broke into Foster's home, shot Foster four times, shot Autumn once, then fled with his own five-month-old baby. As explained in Part I, the baby died of severe injuries to the head and chest, inflicted while under Franklin's care, and the trial court observed at sentencing that Franklin's crimes followed his expressed threats to harm both Autumn and their child. The trial court appropriately found as aggravating circumstances the young age of the murder victim and Franklin's position of trust with the child as the baby's father. The trial court also observed that each offense was separately contemplated, planned, and carried out. As to the character of the offender, the trial court found a high risk that Franklin, nineteen at the time of these crimes, would commit another crime based on two prior residential burglary convictions as a juvenile. It also observed that he committed the second burglary within days of being discharged from probation on the first one. Based on these considerations, the trial court concluded that enhanced and consecutive terms totaling 125 years were appropriate. We cannot say that the sentence was "clearly, plainly, and obviously" unreasonable, and accordingly decline to revise Franklin's sentence.

### Conclusion

The judgment of the trial court is affirmed.

SHEPARD, C.J., and DICKSON and SELBY, JJ., concur.

SULLIVAN, J., concurs except as to sentence.