

FILED
Mar 19 2019, 10:14 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Megan Shipley
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Jesse R. Drum
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

Ziad Abd,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

March 19, 2019

Court of Appeals Case No.
18A-CR-782

Appeal from the Marion Superior
Court

The Honorable Lisa F. Borges,
Judge

Trial Court Cause No.
49G04-1605-MR-20441

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Defendant, Ziad Abd (Abd), appeals his conviction and sentence for murder, Ind. Code § 35-42-1-1(1); and robbery resulting in bodily injury, a Level 5 felony, I.C. § 35-42-5-1(1).

[2] We affirm.

## ISSUES

[3] Abd presents us with five issues on appeal, which we restate as:

(1) Whether the trial court erred when it admitted evidence procured pursuant to certain search warrants;

(2) Whether the State proved beyond a reasonable doubt that Abd committed the offenses;

(3) Whether the trial court committed fundamental error by failing to give a certain instruction on circumstantial evidence;

(4) Whether the trial court committed fundamental error when it asked Abd's counsel if Abd would exercise his right of allocution at sentencing; and

(5) Whether Abd's sentence is inappropriate in light of the nature of his offenses and his character.

## FACTS AND PROCEDURAL HISTORY

[4] Mohamed Mahmoud[1] (Mahmoud) ran a tax preparation business, Taxesmart, on the west side of Indianapolis, Indiana. Mahmoud often worked late into the night and only accepted cash, which he deposited in a safe that he kept in his office under his desk. Only Mahmoud knew the keypad combination to the

---

[1] Mahmoud was also known as Adel Helmi.

safe, and there was no key backup to open it. Mahmoud charged $300 to $350 per tax return. During tax season, Mahmoud saw approximately twenty clients per day. Mahmoud had prepared Abd's tax return in the past, and they attended the same mosque.

[5] Abd and his son, Akram Abd (Akram), had a reported combined total income of less than $20,000 for the tax years 2013, 2014, and 2015. Abd had been evicted or had eviction proceedings instigated against him at his previous two residences for failure to pay rent, and by April 2016, eviction proceedings had been instigated against him at his current residence at the Cherry Glen Apartments. Abd's black, four-door 2012 Toyota Camry had been repossessed for non-payment in January 2016, and he was still behind in his payments as of April 2016. Akram drove a white, four-door 2012 Ford Taurus, which had tinted windows and a sunroof, but he was also behind in his payments. In the year preceding April 2016, Abd never had more than $32 in his bank account, and Akram's bank account had been closed in February 2016 with a negative balance of $700.

[6] In the early days of April 2016, Abd appeared at Taxesmart inquiring about the location of one of Mahmoud's other businesses. The employee speaking with Abd did not know the location of the other business, but he instructed Abd to ask Mahmoud, who was working in his office at the time. Abd left without speaking to Mahmoud. Around midnight on April 20, 2016, an officer with the Speedway Police Department observed Abd and Akram sitting in Akram's Ford Taurus parked at the Wayne Township School Corporation's

administrative building. The car was parked such that Abd and Akram had a direct view of the front door of Taxesmart across the street where Mahmoud was still working that evening. Abd and Akram eventually left the Taurus, walked to a nearby gas station, returned to their car, and, after speaking briefly with the officer, drove away.

[7] Surveillance footage showed Mahmoud locking the door to his business and leaving work at 1:37 a.m. on April 21, 2016. At 2:18 a.m. someone appearing much taller than Mahmoud's five feet, one inch, unlocked the door of Taxesmart and left approximately a minute and a half later carrying something. At 2:20 a.m. Akram called Abd on his cell phone. Abd and Akram left Indianapolis in their separate vehicles during the early morning hours of April 21, 2016. Akram called Abd seventeen times between 2:20 a.m. and 7:00 a.m. They drove east to Dayton and then north to Detroit, where they abandoned Akram's Ford Taurus on the side of the highway.

[8] Around 7:00 a.m. on April 21, 2016, Mahmoud's body was found at the Airport Office Center office park (AOC) on the west side of Indianapolis by a man who spotted the body as he went to the office park dumpster. Mahmoud's legs were bound with duct tape at the ankles, and his arms were bound with duct tape behind his back. Mahmoud's head had been covered with a grey and white patterned pillowcase which had been filled with approximately one pound of feces. The pillowcase was duct taped around Mahmoud's neck. Mahmoud had died of asphyxiation due to the ligature of duct tape around his

neck, the binding of his hands behind his body, and the inhalation of feces, which had completely blocked his respiratory and alimentary systems.

[9]     Surveillance cameras at the AOC captured images of a white four-door sedan with tinted windows and a sunroof entering the office park at 1:54 a.m. on April 21, 2016. The same white sedan left the office park at 2:10 a.m., followed by a black four-door sedan. No other cars were seen on the footage entering or leaving the AOC overnight. Investigators soon learned that Abd and Akram had been parked across the street from Taxesmart hours before Mahmoud had been found dead, and Taxesmart employees identified Abd after being shown surveillance footage from the gas station Abd and Akram visited the night of April 20, 2016.

[10]    Investigation subsequently revealed Abd's and Akram's ownership of the black 2012 Toyota Camry and the white 2012 Ford Taurus and that Akram had purchased a maroon Ford Explorer for $4,274.65 in cash on April 25, 2016. Investigators wished to search those vehicles, Abd's Cherry Glen apartment, and Abd and Akram's cell phone records. The Marion Superior Court had recently begun a test program which would allow select officers of the Indianapolis Metropolitan Police Department to submit search warrant applications electronically. On May 21, 2016, Detective Daniel Kepler (Detective Kepler), prepared an application for five search warrants to search Abd and Akram's cell phone records, the maroon Ford Explorer, the black Toyota Camry, the white Ford Taurus, and the Abd apartment at Cherry Glen. Detective Kepler prepared seven documents as part of his search warrant

packet: an electronic search warrant submission form (ESWSF), a probable cause affidavit, and five proposed search warrants. Detective Kepler first prepared his probable cause affidavit, which he signed with his electronic signature, "s/Daniel Kepler." (State Exh. 3, Confidential Exhibit Vol. I, p. 15).[2] After preparing the probable cause affidavit, Detective Kepler prepared the ESWSF, which had fields for him to complete. Detective Kepler typed in his name and contact information. In the "Instructions" field, Detective Kepler typed "one (1) PC for 5 SW'S." (State Exh. 3, Conf. Exh. Vol. I, p. 2). At the bottom of the ESWSF was the following text: "**I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing and following representations in this document are true.**" (State Exh. 3, Conf. Exh. Vol. I, p. 2) (bolded in the original).

[11] Detective Kepler attached the completed ESWSF, the probable cause affidavit, and the proposed search warrants and submitted the search warrant packet electronically to the Marion County Clerk, who assigned the application a case and transaction ID number. The packet was then transmitted to Judicial Officer Peggy Hart, who granted the request for the search warrants. Execution of the search warrants on May 25, 2016, yielded many pieces of evidence, including a tax form showing that Akram had worked for a business that had its office at the AOC in 2013, a receipt for a roll of duct tape that had been

---

[2] Page numbers are to the exhibits themselves, as the exhibit volumes are not paginated.

purchased on April 12, 2016, that matched the brand and type of duct tape found on Mahmoud's body, a set of sheets that matched the pillowcase found on Mahmoud's head but from which the pillowcases were missing, and a receipt for a cashier's check which led to the discovery that Abd had purchased a home in Detroit on May 3, 2016, for $35,679.52. Investigators also found documentation that Abd had wired $3,500 to a relative in Iraq on April 27, 2016, and an additional $3,500 to the same relative on April 28, 2016. Cell phone data netted from the search warrants showed that Abd's and Akram's cell phones had been in the area of Taxesmart and the AOC during the evening of April 20, 2016, and the morning of April 21, 2016, and that Abd had deleted Mahmoud's contact information from his cell phone.

[12]     On May 25, 2016, Abd and Akram were arrested. Abd had $5,322 on his person when he was taken into custody. On May 27, 2016, and July 26, 2016, the State filed Informations, charging Abd with murder, felony murder, and robbery resulting in serious bodily injury, a Level 2 felony. On September 1, 2017, Abd filed a motion to suppress evidence procured as a result of the May 21, 2016, electronic search warrants. The parties agreed to submit evidence and argument on the motion to suppress in writing to the trial court in lieu of a hearing. On August 23, 2017, the trial court denied Abd's motion to suppress based on the May 21, 2016, search warrants.[3]

---

[3] The chronological case summary indicates that on August 23, 2017, the trial court signed an order denying Abd's motion to suppress. A copy of that order is not part of the record on appeal.

[13] Abd and Akram were tried together. Their jury trial took place on February 9, 2018, to February 22, 2018. Abd's counsel raised a continuing objection to the admission of evidence netted from the May 21, 2016, search warrants, and the trial court incorporated all of the suppression evidence and arguments into the trial record. Evidence was produced at trial that Abd had also worked for businesses that had their offices at the AOC. Akram's fingerprint was found on the keypad to Mahmoud's safe, which had been emptied and left open. On April 25, 2016, Akram paid the back rent at Cherry Glen apartment and paid the May 2016 rent in full. On May 21, 2016, Abd paid off the $4,700 balance on his black Toyota Camry, and by May 25, 2016, he was attempting to sell the car. Akram testified that his fingerprint was on the keypad of Mahmoud's safe because he had accidentally knocked the keypad out of the safe while giving Mahmoud an estimate for carpet replacement. As rebuttal to that testimony, the State introduced a jailhouse telephone call from Akram to his girlfriend placed before his print had been discovered on the safe. In the call, Akram stated that he and his father had had no communications with Mahmoud apart from having their taxes done in the past. Prior to jury deliberations, Abd did not request that the trial court give the jury an instruction that, because the State's case was entirely circumstantial, it must exclude all reasonable theories of innocence before convicting him of the offenses. The jury found Abd guilty of all charges.

[14] On March 13, 2018, the trial court entered judgment on Abd's murder conviction. Due to double jeopardy concerns, the trial court vacated Abd's

felony murder conviction and entered judgment on the robbery conviction as a Level 5 felony. Prior to rendering sentence, the trial court asked Abd's counsel if Abd would exercise his right to allocution prior to sentencing. Abd's trial counsel responded that Abd would not exercise his right. The trial court found as mitigating circumstances that Abd had minor children and had minimal contact with the criminal justice system prior to the offenses. The trial court found as an aggravating circumstance the extreme inhumanity of the offenses. The trial court found that the aggravating circumstance overwhelmingly outweighed any of the mitigating circumstances. The trial court sentenced Abd to sixty-five years for his murder conviction and to six years for his robbery conviction, to be served consecutively, for an aggregate sentence of seventy-one years.

[15] Abd now appeals.[4] Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

## I. *Oath Supporting the Probable Cause Affidavit*

[16] Abd contends that the trial court erred when it admitted evidence procured pursuant to the May 21, 2016, search warrants. More specifically, he argues that the search warrants were defective because they were not supported by a sworn probable cause affidavit. As a general matter, we review the trial court's decision on the admission of evidence for an abuse of the trial court's

---

[4] Akram appealed his convictions under Cause Number 18A-CR-780.

discretion. *Guilmette v. State*, 14 N.E.3d 38, 40 (Ind. 2014). When a defendant challenges the trial court's evidentiary ruling with an argument that impugns the constitutionality of the search or seizure of the evidence, he raises a question of law that we consider *de novo*. *Id*. at 40-41.

[17] The Fourth Amendment to the United States Constitution and Article 1, Section 11, of our Indiana Constitution require that search warrants be supported by a sworn statement of probable cause. Our legislature has codified these constitutional requirements in Indiana Code section 35-33-5-1(a), which provides that a trial court "may issue warrants only upon probable cause, supported by oath or affirmation[.]" Indiana Code section 35-33-5-2(c) provides in relevant part that, when an officer applies for a search warrant,

> [a]n affidavit for search substantially in the following form shall be treated as sufficient:
>
> * * * *
>
> In accordance with Indiana Trial Rule 11, I affirm under the penalties for perjury that the foregoing representations are true.
>
> _____
>
> (Signed) Affiant Date.

[18] In addition, in Indiana, an officer seeking a search warrant may transmit a probable cause affidavit electronically and "may use an electronic signature on the affidavit and warrant." I.C. § 35-33-5-8(a)(4), (h). An electronic signature

may be indicated by "'s/Affiant's Name'" or "by any other electronic means that identifies the affiant [] and indicates that the affiant [] adopts the contents of the document to which the electronic signature is affixed." I.C. § 35-33-5-8(h). Because Abd does not argue that these Indiana statutes are constitutionally deficient, we will resolve his claims on statutory grounds. *See State v. Brown*, 840 N.E.2d 411, 414 (Ind. Ct. App. 2006) (noting our obligation to avoid constitutional questions if possible).

[19] Here, Detective Kepler submitted a search warrant packet containing the ESWSF, his probable cause affidavit, and the five proposed search warrants. In the ESWSF, Detective Kepler specified that he was submitting one probable cause affidavit for all five proposed search warrants. At the bottom of the ESWSF completed by Detective Kepler was the pre-printed verification, "**I swear (affirm), under penalty of perjury as specified by IC 35-44-2-1, that the foregoing and following representations in this document are true**." (State Exh. 3, Conf. Exh. Vol. I, p. 2) (original in bold). This verification tracked the language of Indiana Code section 35-33-5-2(c), in that it was made under the penalty of perjury and contained a statement on veracity. Detective Kepler attached the ESWSF containing his verification to his probable cause affidavit which bore his electronic signature at its end, as provided for by Indiana Code section 35-33-5-8(h). We conclude that, because the search warrant packet contained an affirmation on veracity under the penalties of perjury and Detective Kepler's electronic signature, his probable cause affidavit was in substantial compliance with Indiana Code section 35-33-5-2(c).

[20] On appeal, Abd essentially contends that Detective Kepler's probable cause affidavit was unsworn because his electronic signature did not appear directly under his verification. We disagree. Although, as Abd argues, Detective Kepler could have placed his signature directly adjacent to his verification and did so in other search warrant applications he submitted in the pilot program, the fact that he did not do so here did not render his probable cause affidavit deficient because nothing in the search warrant statute requires that an affiant's signature appear directly under the verification. *See* I.C. § 35-33-5-2(c) (requiring that the oath supporting a probable cause affidavit be "substantially in the following form"); *see also Adamovich v. State*, 529 N.E.2d 346, 348 (Ind. Ct. App. 1988) (finding that the verification requirement was fulfilled where the probable cause affiant's signature did not directly follow his verification but where he signed each page of the probable cause affidavit). In addition, Detective Kepler's verification explicitly referred to the "foregoing and the following representations" which included by reference the probable cause affidavit to which he had affixed his electronic signature, and so the verification and the signature were linked by the language of the verification itself. (State Exh. 3, Conf. Exh. Vol. I, p. 2). We do not find that reference incorporating the probable cause affidavit which followed the verification to be vague, as Abd argues on appeal. We also disagree with Abd's assertion that the form of Detective Kepler's verification was the result of a cut and paste error. Detective Kepler testified in his deposition that he had copied and pasted the portion of his probable cause affidavit pertaining to cell phone records from another

template, but he never testified that he intended to copy and paste something from that template that he mistakenly did not.

[21] Abd also argues that "a pre-printed statement at the very bottom of a form does not have the solemnity required of an oath or affirmation" and that "[a]llowing the centuries-old oath or affirmation requirement to be satisfied by a pre-printed, unsigned statement at the bottom of a form would reduce the requirement to an empty formality." (Appellant's Br. p. 37). However, Abd ignores the fact that Detective Kepler did affix his electronic signature as specifically provided for by Indiana statute and that there is no requirement in the statute that an affiant personally type his verification before signing it. *See* I.C. § 35-33-5-2(c). Detective Kepler's affirmation substantially complied with Indiana Code section 35-33-5-2(c), and so we find no abuse of discretion on the part of the trial court in admitting evidence procured as a result of the execution of the May 21, 2016, search warrants.

## II. *Sufficiency of the Evidence*

[22] Abd contends that his convictions for robbery and murder must be reversed because the State failed to prove the offenses beyond a reasonable doubt. It is well-settled that upon review of the sufficiency of the evidence to support a conviction, we neither reweigh the evidence nor judge the credibility of witnesses, and we will affirm if there is substantial evidence of probative value supporting each element of the crime from which a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Prickett v. State*, 856 N.E.2d 1203, 1206 (Ind. 2006). We consider only the probative

evidence and reasonable inferences that support the verdict. *McHenry v. State*, 820 N.E.2d 124, 126 (Ind. 2005). A conviction for murder or robbery may be based on circumstantial evidence. *Sallee v. State*, 51 N.E.3d 130, 134 (Ind. 2016) (affirming murder conviction based on circumstantial evidence); *Moore v. State*, 652 N.E.2d 53, 55 (Ind. 1995) (affirming murder and robbery conviction based on circumstantial evidence).

[23] The State charged Abd with murder for knowingly or intentionally killing Mahmoud. In order to prove that Abd committed robbery as a Level 5 felony for the acts charged in the Information, the State was required to show that Abd took money from Mahmoud by restraining him and suffocating him. The State showed at trial that, at the time of the murder and robbery, Abd was in financial difficulty. Abd, who was historically a low-earner who had little money in the bank, had been forced from his two previous residences for non-payment of rent, his car had been recently repossessed for non-payment, and he continued to be delinquent in his car payments. Just before the offenses, eviction proceedings had been instigated again against Abd for non-payment of rent. Although the State was not required to show motive in order to make its case, this evidence supported a reasonable inference that Abd was financially motivated to commit the offenses. In the weeks before the murder and robbery, either Abd or Akram purchased a roll of duct tape identical to that found on Mahmoud, and Abd went to Mahmoud's place of business claiming to want information which he left without procuring. Hours before Mahmoud was found dead and his safe emptied, Abd and Akram sat in a parked car across the

street from the front door of Taxesmart. This evidence supported a reasonable inference that Abd and Akram planned the offenses together.

[24] Mahmoud, who was the only person who knew the keypad code to his safe, sustained several head and body wounds before he died by being suffocated in a pillowcase filled with feces. That pillowcase matched a sheet set found at Abd's residence, a set from which the pillowcases were missing. Surveillance footage showed cars matching Abd's and Akram's at the AOC hours before Mahmoud's body was discovered there. Abd and Akram had both worked for employers who had offices at the AOC. Cell phone data verified that Abd and Akram were in the vicinity of Taxesmart at the time surveillance footage captured someone entering to empty the safe. Approximately one minute after that person exited Taxesmart, Akram placed a call to Abd. Akram's fingerprint was found on the keypad of Mahmoud's safe without viable explanation. Abd and Akram fled Indianapolis early in the morning of April 21, 2016, and drove to Detroit where they abandoned the white Ford Taurus that was caught on camera leaving the AOC. After April 21, 2016, Abd bought a house in Detroit with a $35,679.52 cashier's check, paid off his Toyota Camry with $4,700 in cash, and sent $7,000 to Iraq. This evidence supports reasonable inferences that Abd acted in concert with Akram to force Mahmoud to provide the keypad code to his safe, kill Mahmoud by binding and suffocating him, and steal Mahmoud's money.

[25] On appeal, Abd argues that the State failed to prove the offenses because the State's cell phone data did not show his exact location around the time of the

offenses, no license plates were captured by surveillance cameras at the AOC, the State did not show exactly where Mahmoud had been killed, there was no DNA, fingerprint or hair evidence tying him to the offenses, the duct tape and the pillowcase used in the offenses were widely available, the State did not establish precisely how much money Mahmoud had in his safe before he was murdered, and he had paid for large purchases in the past with cash. All of these arguments are unavailing given our standard of review which precludes us from reweighing the evidence presented at trial or considering evidence that does not support the jury's verdict. *See McHenry*, 820 N.E.2d at 126.

[26] Abd also argues that, although the State may have shown that Akram entered Taxesmart and stole Mahmoud's money, there was nothing linking Abd himself to the robbery. However, the jury was instructed that "[a] person is responsible for the actions of another person when, either before or during the commission of a crime, he knowingly aids, induces, or causes the other person to commit a crime." (Appellant's App. Vol. IV, pp. 80-81). Abd performed what was reasonably considered to be reconnaissance of the Taxesmart premises shortly before the robbery, he was with Akram hours before the robbery watching the Taxesmart premises, Abd and Akram worked together to dump Mahmoud's body at the AOC, Akram called Abd immediately after exiting Taxesmart with Mahmoud's money, Abd assisted Akram in abandoning the Taurus outside Detroit, and Abd shared in the profits of the robbery. The jury reasonably inferred from this evidence that Abd acted as an accomplice to

the robbery. We conclude that the State proved beyond a reasonable doubt that Abd committed the offenses of murder and robbery.

### III. *Jury Instruction*

Abd also contends that because the State's case was entirely circumstantial, the trial court committed fundamental error by omitting an instruction that the jury must require that proof be so conclusive and sure as to exclude every reasonable theory of innocence before convicting him of the offenses. However, Abd neither proffered his desired instruction, nor did he object at trial to the trial court's failure to *sua sponte* provide the instruction. The failure to tender an instruction or to object at trial to the omission of an instruction generally waives any claim of error on appeal. *Franklin v. State*, 715 N.E.2d 1237, 1241 (Ind. 1999). Abd argues that the trial court's omission of his unrequested instruction was fundamental error, but our supreme court has consistently held that there is no fundamental error in a trial court's failure to *sua sponte* give such an instruction where the defendant does not request it. *See Maul v. State*, 731 N.E.2d 438, 441 (Ind. 2000) ("The defendant also attempts to overcome procedural default by asserting that the trial court's omission constitutes 'fundamental error.' It does not."); *see also Franklin*, 715 N.E.2d at 1241; *Bunch v. State*, 697 N.E.2d 1255, 1257 (Ind. 1998); *Whatley v. State*, 685 N.E.2d 48, 49-50 (Ind. 1997); *Sanchez v. State*, 675 N.E.2d 306, 308-09 (Ind. 1996)).

Abd urges us to overlook the effect of his failure to preserve the issue, relying on *Hampton v. State*, 961 N.E.2d 480 (Ind. 2012), which clarified the language and use of jury instruction in cases where the State relies entirely on circumstantial

evidence. The supreme court held that, where the trial court determines that a defendant's conduct required for the commission of the charged offense is established entirely by circumstantial evidence, the jury should be instructed that "[i]n determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence." *Id*. at 491. However, *Hampton* was a case wherein the desired instruction had been requested but had been refused by the trial court, and so it does not provide authority for overriding our supreme court's precedent on fundamental error. *Id*. at 483. Indeed, *Hampton* recognized the long history of the importance of the instruction to Indiana jurisprudence, dating back to at least 1896. *Id*. at 484. In no case over the long history of the instruction in this state has the supreme court held that failure of the trial court to give the instruction *sua sponte* constitutes reversible, fundamental error. We are bound by the precedent of our supreme court. *Swihart v. State*, 71 N.E.3d 60, 64 (Ind. Ct. App. 2017). Concluding that Abd waived his claim of instructional error and that the trial court's failure to give the instruction *sua sponte* did not constitute fundamental error, we leave the jury's verdicts intact.

## IV. *Sentencing Allocation*

[29] Abd argues that the trial court committed fundamental error when it failed to ask him directly, as opposed to through his counsel, whether he wished to exercise his right to allocation prior to sentencing. The State counters that Abd waived his right to allocation by failing to object and that, in any event, Abd

has failed to establish that he was prejudiced by the trial court's actions. "A defendant's right to offer a statement on his or her behalf before the trial court pronounces sentence is known as the right of allocution." *Woods v. State*, 98 N.E. 3d 656, 661 (Ind. Ct. App. 2018), *trans. denied*. In Indiana, that right has been preserved by statute, which provides that a defendant may

> make a statement personally in the defendant's own behalf and, before pronouncing sentence, the court shall ask the defendant whether the defendant wishes to make such a statement.

I.C. § 35-38-1-5.

In *Jones v. State*, 79 N.E.3d 911 (Ind. Ct. App. 2017), this court reversed and remanded for resentencing because the trial court asked Jones' counsel, rather than Jones himself, whether Jones would like to exercise his right of allocution. *Id.* at 917. Jones' counsel declined Jones' allocution right on Jones' behalf. *Id.* at 916. Jones did not object or speak up when his counsel declined. *Id.* Comparing the right to allocution with the right to trial by jury, the court addressed Jones' claim as fundamental error and did not require Jones to demonstrate prejudice as a result of the trial court's actions. *Id.* at 915-17. Chief Judge Vaidik, dissented, noting that, unlike the jury trial right, the right to allocution was not constitutionally based and that our supreme court had already held in *Angleton v. State*, 714 N.E.2d 156, 159 (Ind. 1999), that a claim of error based on the denial of the right to allocution could be waived by failure to object or speak out at sentencing. *Id.* at 918.

[31]     Our supreme court has not decided a case with this precise set of facts, namely where the trial court asks the defendant's counsel, rather than defendant himself, whether defendant will allocute. However, in *Woods*, another panel of this court faced with facts similar to *Jones* held, citing *Angleton*, that Woods had waived his claim of allocution error by failing to speak up or object when his counsel declined the right of allocution on Woods' behalf. *Id*. at 663-64. The *Woods* court also noted that such claims were subject to harmless error analysis, citing *Vicory v. State*, 802 N.E.2d 426, 430 (Ind. 2004) (holding that the trial court's denial of probationer's request to allocate prior to sanctioning was error that did not merit reversal), and *Biddinger v. State*, 868 N.E.2d 407, 410 (Ind. 2007) (holding that trial court's refusal to allow the defendant to allocate prior to sentencing following his guilty plea was harmless error). *Id*. at 663. We find the *Woods* decision to be more persuasive and hold that Abd's claim is subject to waiver and to harmless error analysis.

[32]     Here, it is undisputed that the trial court did not personally ask Abd whether he would like to exercise his right to allocution or make a statement prior to sentencing. The trial court asked Abd's counsel if Abd would exercise the right, and his counsel declined. However, it is equally undisputed that Abd failed to speak up or object when his counsel declined to make a statement on his behalf. Although Abd relied on a translator at sentencing, there is no indication in the record that the trial court's colloquy with Abd's counsel was not translated. In line with *Angleton* and *Woods*, we hold that Abd waived his claim by failing to speak up at sentencing. Following the precedent of *Vicory* and *Biddinger*, we

also agree with the State that Abd has failed to make any argument on appeal that he was prejudiced by the trial court's actions, and so we conclude that he has failed to persuade us that his substantial rights were prejudiced. Because Abd waived his claim of allocution error and has failed to demonstrate that his substantial rights were prejudiced, we affirm the trial court's sentencing.

## V. *Sentence*

[33] Lastly, Abd requests that we review his sentence, which he contends is inappropriate in light of the nature of his offenses and his character. The Indiana Constitution and Indiana Appellate Rule 7(B) permit an appellate court to revise a sentence if, after due consideration of the trial court's decision, the sentence is found to be inappropriate in light of the nature of the offense and the character of the offender. *Robinson v. State*, 91 N.E.3d 574, 577 (Ind. 2018). "The principal role of such review is to attempt to leaven the outliers." *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). The defendant bears the burden to persuade the reviewing court that the sentence imposed is inappropriate. *Robinson*, 91 N.E.3d at 577.

[34] The jury found Abd guilty of murder and robbery as a Level 2 felony, upon which the trial court entered judgment of conviction as a Level 5 felony. The sentencing range for murder is from forty-five to sixty-five years, with the advisory being fifty-five years. I.C. § 35-50-2-3. The sentencing range for a Level 5 felony is from one to six years, with the advisory being three years. I.C. § 35-50-2-6. The trial court sentenced Abd to sixty-five years for his murder conviction and to six years for the robbery conviction, to be served

consecutively. Thus, the seventy-one-year sentence imposed by the trial court represented the maximum possible for the offenses.

[35] Abd concedes that his offenses were "serious and disturbing." (Appellant's Br. p. 67). Abd and Akram targeted a man small in stature who had helped them with their taxes in the past and who apparently had little to no security on his business premises. The offenses were not spur of the moment lapses in judgment. Abd and Akram planned and prepared by purchasing the duct tape, casing the Taxesmart business premises, and lying in wait for Mahmoud to finish work on the night of April 20, 2016. There is evidence in the record that Mahmoud was beaten before his death, presumably so that he would surrender the code to the safe. Mahmoud was bound and spent his last waking minutes "drowning in a bag of feces," as the forensic pathologist testified at trial. (Transcript Vol. III, p. 155). Abd and Akram abandoned Mahmoud's body by a dumpster as though he were refuse. All of this occurred purely for Abd's and Akram's financial gain. We characterize the offenses as heinous and find nothing inappropriate about the maximum sentence imposed by the trial court.

[36] As to his character, Abd argues that his relative lack of criminal history, his productivity as a worker, and his status as a former refugee merit a reduced sentence. While it is true that Abd's sole conviction was in May 2015 for operating while intoxicated endangering a person, a non-violent offense, we note that he was granted probation in that case, admitted to violating his probation in November 2015, and was still on probation when he committed the instant offenses. Abd reported to his probation officer in June, August, and

October 2015 that he was unemployed and would have problems paying his probation fees. However, he reported to the pre-sentence investigator in this matter that he was employed as a baker during that period. Thus, it is difficult to discern Abd's true work productivity given Abd's apparent lack of candor. In short, we find, as did the trial court, that any positive aspects of Abd's character are greatly outweighed by the heinousness of his offenses, and we affirm the maximum sentence imposed by the trial court.

# CONCLUSION

[37] Based on the foregoing, we conclude that the trial court admitted evidence procured pursuant to valid search warrants, the State proved beyond a reasonable doubt that Abd committed murder and robbery, and Abd waived his challenges to the trial court's jury instruction and allocution procedure. In addition, we conclude that Abd's sentence is not inappropriate given the nature of his offenses and his character.

[38] Affirmed.

[39] Kirsch, J. and Robb, J. concur